UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL E. MEGGINSON,

                              Plaintiff,

            – against –

THE CITY OF NEW YORK, LOUIS
MOLINA, CHRISTOPHER MILLER,
LILWANIA GLOVER, *and* RONALD
MILLER,

                              Defendants.

<u>**OPINION & ORDER**</u>

23 Civ. 6798 (ER)

<u>Ramos</u>, D.J.:

        Michael E. Megginson, a pretrial detainee at Rikers Island, brings this *pro se*

action *in forma pauperis* against the City of New York (the "City"), Louis Molina, Rikers

Island Department of Corrections ("DOC") Commissioner ("Commissioner Molina"),

Deputy Commissioner Christopher Miller ("Deputy Commissioner Miller"), Assistant

Deputy Warden Lilwannia Glover ("ADW Glover"), and Acting Warden of Rikers Island

West Facility Ronald Miller ("Warden Miller") (collectively, "Defendants").  Megginson

alleges, pursuant to 42 U.S.C. § 1983, that Defendants deprived him of his constitutional

rights under the Eighth and Fourteenth Amendments, by exercising deliberate

indifference to (1) his medical needs after he fell through a collapsed floor, and (2) the

inhumane and unsafe conditions of his confinement, including a vermin infestation

resulting in a serious infection.  Megginson additionally alleges a state law negligence

claim.

        Before the Court is Defendants' motion to dismiss, Doc. 14.  For the reasons set

forth below, the motion is GRANTED in part and DENIED in part.

## I.     BACKGROUND

        The following facts are drawn from allegations contained in the complaint, Doc.

1, which the Court accepts as true for purposes of the instant motion, *Walker v. Schult*,

717 F.3d 119, 124 (2d Cir. 2013), as well as from three other documents filed by Megginson:  his "notice of motion of opposition," Doc. 19;[1] a "motion to request summary judgment and towards settlement agreement," Doc. 20; and his surresponse to Defendants' motion to dismiss, Doc. 26.  *See Forrest v. City of New York*, No. 21 Civ. 10152 (LJL) (BCM), 2023 WL 2432493, at *5 (S.D.N.Y. Feb. 1, 2023), *report and recommendation adopted*, 2023 WL 2433115 (S.D.N.Y. Mar. 9, 2023) (internal quotation marks and citations omitted) ("[A]lthough ordinarily a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss, in a *pro se* case the court may, in its discretion, consider factual allegations made in the plaintiff's opposition papers as supplementing the Complaint, at least to the extent they are consistent with the allegations in the Complaint.").

### A.  Factual Background

#### 1.  *Collapsed Floor and Vermin Infestation*

Megginson alleges that he was housed in "an unsafe, hazardous, unsecured cell, in which the floor area by the shower caved in and sunk," allegedly due to vermin eating the plaster, causing him to fall into and get stuck in the hole.  Doc. 1 at 4.  He also alleges that he was bitten by vermin because the cell was "never . . . properly sealed."  *Id.* at 5.

The events at issue occurred between July 10 and July 17, 2023.[2]  *Id.* at 4.  On

---

[1] The full title of this document is:  "Notice of Motion of Opposition of Response to Defendants['] Motion. And a Motion to Overrule Defendants Motion['] to Dismiss Complaint [and] to [G]rant Summary Judgment to pro se Litigant."  Doc. 19.

[2] The complaint was submitted via an S.D.N.Y. Prisoner Complaint Form.  Doc. 1.  The certification page was signed and dated on "7/17/2023."  *Id.* at 6.  The complaint was post-marked on July 27, 2023, then received and filed by the Court on August 2, 2023.  *Id.* at 1, 7.  However, the field of the certification page titled "Date on which I am delivering this complaint to prison authorities for mailing" was left blank.  *Id.* at 6.  It is therefore presumed that the effective date of Megginson's complaint is July 17, 2023.  This form also contains the following language on the signature page under "Plaintiff's Certification and Warnings":  "I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required."  *Id.* at 6.

July 10,[3] Megginson was exiting the shower at the Rikers Island West Facility when he heard a "large cracking sound" and the floor "caved in and sunk in due to vermin[] (bug[s]/insects) eating up the plaster, wood, and iron on the floor's drain area." *Id.* Megginson's "right knee, calf, and foot fell through the floor." *Id.* He was subsequently stuck in the collapsed floor "for hours" before managing to pull himself free. *Id.*

Megginson contacted the City's 311 hotline (hereinafter the "311 System"),[4] "B.O.C.,"[5] and private defense attorney Jesse Hoberman-Kelly concerning the incident and his need for "serious medical treatment for possible injuries." *Id.* Megginson additionally claims that at some point after removing himself from the hole, "Alam[6] and [an]other officer . . . call[ed] for a medical emergency" and "311 sent EMS ambulatory services to respond." Doc. 19 ¶ 1. However, Megginson alleges Defendants did not allow EMS to respond, as Warden Miller and ADW Glover told the facility to not allow EMS in. *Id.*

Megginson alleges that he was not given medical treatment for days until "[he] could no longer walk properly." Doc. 1 at 5. Megginson alleges that Warden Miller investigated "cell 10-05 in Sprung 9-10"[7] on four occasions "throughout the week of July

---

[3] Megginson does not state exactly when the floor collapsed; however, given that he discusses the cracking of the floor and his fall into it at the start of his complaint, the Court assumes that he fell into the hole on July 10, the first "date of occurrence" identified in the complaint. Doc. 1 at 4.

[4] Incarcerated individuals submit complaints through the Inmate Grievance and Request Program (IGRP), which provides that an inmate can file a grievance in writing or by calling the City's 311 customer service hotline. Doc. 16 at 6 n.1 (citing IGRP, §§ III.A, III.V, available at https://www.nyc.gov/assets/boc/downloads/pdf/Meetings/2018/June-12-2018/GrievanceAuditReport_Final_2018.11.06.pdf).

[5] While Megginson does not define "B.O.C.," he elsewhere refers to the "Board of Corrections." For example, he notes that he contacted "Ms. Glover of the New York City's Board of Corrections" about his claims. Doc. 1 ¶ 1. The New York City Board of Correction is a non-judicial oversight board that monitors the city's correctional facilities.

[6] Megginson does not identify who "Alam" is.

[7] Megginson refers to "cell 10-05," "cell #10-05," or "cell (10.05)," as well as "9-10 Spring" or "9-10 Sprung," at various points across his submissions. Despite the slight variations in spelling, the Court assumes that all mentions of a cell accompanied by "10-05" or "10.05" refer to the cell that Megginson was housed in, and that the cell was located in an area called "9-10 Spring" or "9-10 Sprung" in West Facility. For clarity, the Court will refer to "cell 10-5" and "9-10 Sprung."

10, 2022."[8]  Doc. 26 at 1 ¶ 3.  However, Megginson was merely "transferred to NiC[9] for suicide watch."[10]  Doc. 1 at 5.  He ultimately saw a medical provider "a while after" that transfer to NIC.[11]  *Id.*

Megginson alleges this was a "frivolous," "illegal [and] unauthorized suicide watch," which lasted no more than 24 hours, after which he was returned to West Facility. Docs. 19 ¶ 1; 26 at 1–2 ¶ 4.  Megginson states he was sent back from NIC before any medical staff or EMS could respond at West Facility 9-10 Sprung.  Doc. 19 ¶ 1.

Upon returning to the West Facility, Megginson was placed back in the same cell.  Doc. 1 at 5.  He alleges that, although some Plexiglass had been applied in the area,[12] bugs infiltrated the area and infested the cell.  Doc. 26 at 2 ¶ 5.  Megginson alleges he was bitten in his sleep on July 12, 2022, and that as a result his face reacted with serious swelling and pus, and that he contracted a fever.  *Id.* ¶ 6.  Megginson states that the bites caused a bad infection for which he was eventually "treated by urgent care." Doc. 20 at 1.

On July 13, 2023, Megginson was again bitten by vermin in his cell, as it was never properly sealed.[13]  Doc. 1 at 5.  He alleges that more bugs were able to infiltrate the cell due to rain as well as flooding caused by a sprinkler malfunction.  *Id.*  Megginson

---

[8] Even though Megginson states Warden Miller's inspections occurred during the week of "July 10, 2022," the Court assumes that Megginson meant to write "2023."  Doc. 26 ¶ 3.

[9] The Court takes "NiC" to mean "North Infirmary Command" as indicated by Defendants in their reply memorandum.  Doc. 16 at 2.  "NiC" and "NIC" are used interchangeably in this opinion.

[10] Megginson provides inconsistent accounts of which defendant placed him on suicide watch.  Whereas, in his memorandum of opposition, Megginson states that it was Deputy Commissioner Miller that placed him on suicide watch, Doc. 19 ¶ 1, in his surresponse, he states it was Warden Miller that placed him on suicide watch.  Doc. 26 at 1 ¶ 4.

[11] Megginson does not indicate precisely when or where he saw a medical provider, but he implies that it was at least "days" after the incident.  *See* Doc. 1 at 5.  He also does not state what kind of care he received.

[12] Megginson states "the patch was covered" with Plexiglass, however he does not specify what the "patch" is—*e.g.*, whether it refers to the hole, a different exposed area in the cell, or something else altogether. Doc. 26 ¶ 5.

[13] Megginson does not make clear what part of the cell was improperly sealed, or whether he refers to the hole itself.

alleges that DOC failed to contact an exterminator for termites which had caused the hole into which he fell.  Doc. 20 at 1.  He alleges that, after days left with an open hole in his cell, he was bitten on his face and body and "stung by a vermin, bug, or wasp."  *Id.*

On July 15, 2023, Warden Miller inspected the cell "on camera."  Doc. 19 ¶ 2. Megginson explained to Warden Miller and "his administration" all of the problems he was experiencing with his cell.  *Id.*  However, he alleges that Warden Miller told him he "should just deal with such conditions."  *Id.* ¶ 2.  Megginson alleges a 311 System operator was "still on the line" and heard this exchange.[14]  *Id.*

Megginson alleges that, despite his repeated attempts to have his issues addressed, as further discussed below, his injury was not treated effectively and he was not taken to the hospital despite the serious nature of his injuries.  Doc. 19 ¶ 6.  Megginson claims he (1) ripped the meniscus in his right knee, (2) was infected by the bugs in the cell, and (3) was left suffering for days in his cell without proper medical attention.  Doc. 20 at 1.

### 2.  *Reports and Grievance Efforts*

Megginson alleges that he exhausted, and attempted to exhaust, administrative remedies, in good faith, by contacting the Prisoner Rights Project ("PRP"),[15] using the 311 System on numerous occasions, as well as by contacting ADW Glover about his claims.  Doc. 19 ¶ 1; *see also* Docs. 20 at 1, 26 at 1 ¶¶ 2, 3.  Megginson alleges that he spoke twice to the "Investigations Department" by phone, and the "issue was looked into," but he received no notice that it was "fully investigated."  Doc. 19 ¶¶ 4.  He additionally alleges that "the Defendant"—though he does not identify an individual— failed to complete such investigation due to transferring him between NIC and West

---

[14] Megginson states that he was using his "J-pay tablet" for this conversation.  Doc. 19 ¶ 2.  *See* JPay Incarcerated Individual Services (last visited Mar. 20, 2025), https://www.jpay.com/FriendsFamily.aspx. The DOC launched a tablet program for people in custody in 2022.  *See* NYC DOC Press Release (Dec. 13, 2022), https://www.nyc.gov/site/doc/media/tablet-program.page.

[15] The Legal Aid Society site describes PRP as "a leading advocate of humane and constitutional conditions in the New York City jails and State prisons," and is available at https://legalaidnyc.org/programs-projects-units/the-prisoners-rights-project/.  Although PRP is not part of the administrative grievance process, the Court infers that Megginson sought guidance or assistance from PRP regarding his complaints.

Facility. *Id.* ¶ 7.  Later, however, Megginson states that Warden Miller "completed the investigation by himself."  Doc. 26 at 3 ¶ 2.  Megginson states that he was transferred to an upstate prison facility by the time his complaint was filed, and that there were "more than 21 to 30" calendar days for his incident to be looked into.  Doc. 19 ¶ 7.

Megginson additionally claims that, during the relevant time period, the West Facility had no grievance officer to submit complaints to in order to exhaust his administrative remedies.  Doc. 26 at 1 ¶ 1.  He nonetheless states that he filed multiple departmental complaints through the 311 System, as well as via email to West Facility's administration, seeking that the hole and bug-bite incidents be investigated.  *Id.* ¶ 2, 6.  He also filed more complaints by calling B.O.C. and PRP.  *Id.* ¶ 3.

Eventually, Megginson was seen by a doctor and was treated with antibiotics, although he does not specify on what date this took place.  *Id.* at 2 ¶ 7.  Finally, Megginson alleges that when Warden Miller showed up on July 14, 2022, he requested that Deputy Warden Glover move Megginson to another cell.  *Id.* ¶ 8.

### 3.  *Request for Relief*

Megginson seeks $350,000.00 in compensatory damages for five injuries:  (1) severe infection caused by bug bites, (2) torn muscles in his leg which caused "serious pain and fluid," (3) neglect—for being left without assistance or medical attention "for hours," (4) pain and suffering, and (5) cruel and unusual punishment and denial of due process caused by Warden Miller's failure to take action for one week.  Doc. 1 at 5.

### B.  Procedural History

Megginson filed this action on August 2, 2023.  Doc. 1.  Defendants filed a motion to dismiss on March 19, 2024.  Doc. 14.

On March 29, 2024, Megginson filed a document responding to Defendants' motion to dismiss and requesting summary judgment.  Doc. 19.  Megginson accuses Defendants of providing arguments that are "malicious, bias[ed], and not base[d] on factual information."  *Id.* ¶ 5.  On April 1, 2024, Megginson filed an additional document

responding to Defendants' motion to dismiss, swearing that the statements in his complaint are factually true, requesting summary judgment, and requesting that the case move onto settlement or discovery.  Doc. 20.  The Court considers both of these documents as Megginson's responses to Defendants' motion to dismiss.

On May 7, 2024, Defendants filed a reply memorandum in further support of their motion to dismiss, which included a request to stay discovery until the instant motion is resolved.  Doc. 22.  On May 9, 2024, the Court granted this request to stay discovery, pending resolution of the motion.  Doc. 24.

On June 6, 2024, Megginson filed a surresponse to Defendants' motion to dismiss, in which he requests leave to amend his complaint.  Doc. 26 at 3 ¶ 4.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6)

In considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Schult*, 717 F.3d at 124.  On such motions, Courts may consider facts stated "on the face of the complaint" and "in documents appended to the complaint or incorporated in the complaint by reference." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The purpose of Rule 12(b)(6) "is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). To state a plausible claim, the plaintiff must "'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. *Pro Se* Plaintiffs

"A pro se litigant's papers must be construed liberally 'to raise the strongest arguments they suggest.'" *Jules v. Andre Balazs Properties*, No. 20 Civ. 10500 (LGS), 2023 WL 5935626, at *2 (S.D.N.Y. Sept. 12, 2023) (quoting *Publicola v. Lomenzo*, 54 F.4th 108, 111 (2d Cir. 2022)). The obligation to read a pro se litigant's pleadings leniently "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010). "However, even pro se plaintiffs asserting civil right claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III.    DISCUSSION

Megginson asserts three claims:  (1) a violation of 42 U.S.C. § 1983 for unconstitutional conditions of confinement, (2) a violation of § 1983 because Defendants unconstitutionally failed to provide him with timely medical care,[16] and (3) a claim of

---

[16] The Court construes the § 1983 claims against the City as *Monell* claims.  *See Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §

negligence for being left without assistance or medical attention for hours, which the Court interprets as a state law negligence claim.

Defendants seek dismissal of Megginson's complaint for (1) failure to exhaust administrative remedies, (2) failure to allege a basis for municipal liability against the City, (3) failure to plead constitutional violations, and (4) failure to establish individual liability, or alternatively, on grounds that the individual defendants are protected by qualified immunity. Defendants additionally argue that the Court should decline to exercise supplemental jurisdiction over Megginson's state law negligence claim.

### A. Exhaustion

"Section 1983 provides a private cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Boyland v. Wing*, 487 F. Supp. 2d 161, 167 (E.D.N.Y. 2007). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Therefore, Megginson is required to exhaust administrative remedies before bringing § 1983 claims.

### 1. The Timing of Megginson's Complaint Indicates Non-Exhaustion

The exhaustion of administrative remedies must be proper, that is, in compliance with a prison grievance program's deadlines and procedural rules. *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006). The applicable prison grievance program here is the New York

---

1983.").

City Department of Correction Directive "Inmate Grievance Procedures" ("IGRP") (No. 3376R-A, effective Dec. 10, 2018).[17]

"[F]ailure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). Including within the IGRP system, "when a plaintiff claims to have filed a grievance, even if he did not 'plead to have followed all the steps required,' nonexhaustion is not apparent." *Howard v. Brown*, 15 Civ. 9930 (ER), 2018 WL 3611986, at *2 (July 26, 2018) (quoting *Cannon v. City of New York*, No. 11 Civ. 8983 (PAE) (JCF), 2013 WL 1234962, at *4 (S.D.N.Y. Jan. 29, 2013), *report and recommendation adopted*, 2013 WL 1248546 (S.D.N.Y. Mar. 27, 2013)); *see also McCoy v. Goord*, 255 F. Supp. 2d 233, 248, 255 (S.D.N.Y. 2003) ("[D]efendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity," and failure to plead compliance with each administrative step, including appeals, "is not a basis for dismissal on a motion to dismiss, for Second Circuit law does not require [the plaintiff] to plead exhaustion to survive a motion to dismiss."). However, if a plaintiff concedes that he did not exhaust administrative remedies, or where non-exhaustion is otherwise "clear from the face of the complaint," the Court may decide the exhaustion issue on a Rule 12(b)(6) motion to dismiss. *Simmons v. Cripps,* No. 12 Civ. 1061 (PAC) (DF), 2013 WL 1290268 at *7–8, (S.D.N.Y. Feb. 15, 2013), *report and recommendation adopted*, 2013 WL 1285417 (S.D.N.Y. Mar. 28, 2013); *see also Shaw v. City of New York*, No. 8 Civ. 3997 (SHS) (JCF), 2009 WL 1110789, at *3-4 (S.D.N.Y. Apr. 21, 2009).

One indicator of whether exhaustion has occurred is the amount of time between the date of the incident and the date in which a plaintiff files a complaint in Court, as enough time must have elapsed for the administrative remedies to be exhausted prior to filing. A period of at least twenty (20) days has been deemed sufficient for the

---

[17] Available at: https://www.nyc.gov/assets/doc/downloads/directives/Directive_3376R-A.pdf (last visited Mar. 24, 2024).

Department of Corrections to process an inmate's complaint in compliance with IGRP procedures. *See Brown v. City of N.Y.*, No. 21 Civ. 4632 (PGG) (SLC), 2023 WL 2908661, at *11 (S.D.N.Y. Jan. 30, 2023) (dismissal warranted where federal complaint was filed "16 days after the First Grievance, and five days after the Second Grievance, less than the 20 days or more that courts have recognized is necessary to afford the DOC an opportunity to complete the IGRP process"); *Miller v. Annucci*, No. 17 Civ. 4698 (KMK), 2019 WL 4688539, at *12 (S.D.N.Y. Sept. 26, 2019) (noting courts "have dismissed claims . . . because it would have been temporally impossible for the plaintiffs to have exhausted their administrative remedies before filing the complaints," where "the period between the date of the alleged incident and the filing of the complaint was 21 or fewer days.") (collecting cases).

Megginson asserts that he, "in good faith," exhausted administrative remedies by contacting the B.O.C. and ADW Glover, and by making "multiple complaints" through the 311 System. Docs. 19 ¶ 1; *see also* Docs. 20 at 1, 26 at 1 ¶¶ 2, 3. Defendants, however, argue that Megginson could not have complied with the grievance procedures contained in the IGRP before filing his complaint in this Court. Doc. 16 at 7, 8. Defendants argue that the IGRP rules and procedures take "many weeks to complete . . . Thus, where an inmate files a federal action within mere days (or a few weeks) of an alleged incident, as here, it is evident from the face of the complaint that the inmate has failed to exhaust his/her remedies under the IGRP." *Id.* at 7–8. Defendants include the following summary of relevant IGRP procedures that would have to be completed before a prisoner can bring a § 1983 claim:

> In summary, (1) the inmate must submit a grievance within ten days of the complained-of incident either on the required form or through a 311 call. IGRP, §§ III.A and III.V; (2) the Grievance Coordinator has seven business days to investigate and render a resolution. IGRP § VI.A.1; (3) if the inmate disagrees with the proposed resolution, the inmate may appeal to the facility's commanding officer. IGRP, § VI.6.a.ii;3 (4) after receipt of the appeal through channels (which may take one business day), the facility's commanding officer has

five business days to issue a determination.  IGRP, § VII.B; (5) if the inmate disagrees with the commanding officer's disposition, the inmate has two business days to appeal to the facility's division chief. IGRP, § VII.D; (6) the facility's division chief must issue a disposition within five business days of receipt of the appeal through channels.  IGRP, § VIII, B; (7) if the inmate disagrees with the proposed disposition, she must appeal to the Central Office Review Committee ("CORC") within two business days of receipt of the division chief's determination. *id.*, and (8) members of CORC must submit to CORC's chairperson, the Director of Constituent and Grievance Services, their respective decisions within five business days of receiving the appeal through channels.  IGRP, § IX, F.1.b.

*Id.* at 6–7.

While the Complaint does not make clear exactly when Megginson made each internal complaint, Megginson did sign and date his civil complaint in the instant action on July 17, 2023.  Doc. 1 at 4, 6.  Even giving Megginson the most generous reading of this timeline—July 10 as the first possible date of incident, seven days before he signed his complaint on July 17—this affords the DOC only one week to have fully undertaken the IGRP grievance procedures.  One week is much shorter than the amount of time that Courts in this jurisdiction have considered sufficient for the DOC to adequately address grievances.  *See Brown v. City of New York*, 2023 WL 2908661 at *11; *Miller*, 2019 WL 4688539, at *12.  Therefore, it is "clear from the face of the complaint" that Megginson has failed to exhaust his available administrative remedies.  *Shaw*, 2009 WL 1110789, at *3–4.

### 2. *The "Special Circumstances" Exception to Non-Exhaustion Applies*

Even where non-exhaustion is apparent, however, there are "special circumstances" in which a plaintiff's failure to comply with administrative procedural requirements is justified.  *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004); *see also Collins v. Goord*, 438 F. Supp. 2d 399, 411 (S.D.N.Y. 2006) (quoting *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is "mandatory," certain caveats apply.'").  "Special circumstances may excuse an inmate from exhausting his administrative remedies where circumstances

'might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way.'" *Kendall v. Cuomo*, No. 12 Civ. 3438 (ALC) (RLE), 2013 WL 5425780, at *4 (S.D.N.Y. Sept. 27, 2013) (finding that plaintiff's reasonable belief that "his claims were not eligible for the grievance process," based on a statement by a DOC hearing officer that his claims were not "administrative in nature" and had to be taken to federal court, constituted "special circumstances" that justified his failure to exhaust administrative remedies).

The Second Circuit utilizes a "three-part inquiry" to determine whether an inmate is excused from the otherwise non-waivable exhaustion requirement. *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). It considers: "(1) whether the administrative remedies were available to the inmate; (2) whether defendants did not preserve the defense, or whether defendants' actions inhibited exhaustion thereby estopping defendants from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement." *Tyler v. Argo*, No. 14 Civ. 2049 (CM) (DCF), 2014 WL 5374248, at *5 (S.D.N.Y. Oct. 10, 2014) (citing *Hemphill*, 380 F.3d at 686). Moreover, "a 'good-faith effort to exhaust' all of the administrative requirements has been deemed an implicit factor in considering whether an inmate should be denied an opportunity to pursue his claim in federal court for failure to comply with administrative procedures." *Id.* (finding plaintiff did not qualify for the exception where he claimed only that he did not *know* how to appeal a grievance, and stating that mere "'lack of knowledge or understanding of the process,' without a plausible claim that Defendants kept him from acquiring information about the grievance process" does not excuse a plaintiff's failure to exhaust); *see also Torres v. Carry*, 672 F. Supp. 2d 338, 345 (S.D.N.Y. 2009) (where plaintiff had not exhausted administrative remedies because the administrative committee to which he filed an appeal had not rendered a final determination, finding that he should nonetheless "not be denied the opportunity to

pursue his grievance in federal court" given he "complied with all of the administrative requirements and made a good-faith effort to exhaust.").

The Court determines that there are "special circumstances" justifying Megginson's non-exhaustion here. *McGinnis*, 380 F.3d at 667. Megginson alleges that he made multiple substantial, good-faith attempts to comply with the exhaustion procedures, and faced significant barriers to compliance. *See, e.g.*, Doc. 19 ¶ 1, Doc. 26 at 1 ¶ 1. Megginson claims, and Defendants do not contest, that the West Facility had no grievance officer with whom to file complaints during the relevant time period. Doc. 26 at 1 ¶ 1. Nonetheless, he filed multiple complaints with the 311 System, via email to the West Facility's administration, and by calling the B.O.C. Docs. 19 ¶ 1, 20 at 1, 26 at 1 ¶¶ 2, 3. Then, after being bitten in his sleep on July 12, 2023, Megginson alleges he again "contacted 311 for another complaint and medical service."[18] Doc. 26 at 2 ¶ 6. In addition to the absence of a grievance officer, Megginson faced the additional hurdle of unclear information as to how, if at all, his complaints were progressing through the grievance system. Megginson claims he twice spoke to the "Investigations Department" by phone, and understood the issue was looked into, however he received no notice that it was "fully investigated." Doc. 19 ¶¶ 4. Megginson then states that "the Defendant" failed to complete such investigation due to transferring him between NIC and West Facility. *Id.* ¶ 7. Later, Megginson states that Warden Miller "completed the investigation by himself." Doc. 26 at 3 ¶ 2. Construing Megginson's papers "to raise the strongest arguments they suggest," *Jules*, 2023 WL 5935626, at *2, Megginson was given conflicting information as to whether the investigation into his claims had concluded, or whether it was merely stalled. Evidently, Megginson faced barriers beyond his control, and he nonetheless made multiple good-faith efforts, through various means, and on multiple occasions, to pursue the administrative remedies available to him.

---

[18] As previously discussed, Megginson does not provide on what specific dates he filed these various complaints. However, Megginson implies that he made complaints on several dates.

Applying the Second Circuit's "three-part inquiry," the Court finds that although (1) administrative remedies were available to Megginson, and (2) Defendants did not fail to preserve their exhaustion defense nor inhibit exhaustion to the point of being estopped from raising the defense, (3) the "special circumstances" exception applies to Megginson in light of the barriers he faced and his "good-faith efforts" to file and move his claims forward notwithstanding them. *Hemphill*, 380 F.3d at 689.

Therefore, Megginson's federal claims under § 1983 may proceed.

### B. Municipal Liability

Defendants argue that Megginson's claims against the City should be dismissed, as Megginson fails to plead a *Monell* claim against it. Doc. 16 at 16.

*Monell* liability is a particular theory of liability for § 1983 claims against municipalities. *See Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983"); *see also Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell*, 436 U.S. at 692)). "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quotation marks and citation omitted).

A plaintiff may satisfy the "custom or policy" requirement by alleging:

(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to

subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*McCormick v. County of Westchester*, 19 Civ. 2916 (KMK), 2023 WL 2632204, at *9 (S.D.N.Y. Mar. 24 2023) (citation omitted). Under any of these theories, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404 (1997). In the context of a motion to dismiss, "a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." *Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (summary order). Lawsuits brought against state officials in their official capacity are treated as cases against the State and "the entity's 'policy or custom' must have played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citation omitted).

Megginson nowhere claims that any of the alleged constitutional violations took place as a result of a City policy, practice or custom, a failure to train or supervise its employees, nor an action "taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question." *McCormick*, 2023 WL 2632204, at *9. Therefore, Megginson has not adequately pleaded a *Monell* claim against the City, and his claims against it are dismissed.

Defendants argue that the Complaint is silent as to whether the individual defendants are "being sued in their official or individual capacities." Doc. 16 at 17. If the individuals were being sued in their official capacities, then to the extent they qualify as "state officials," Megginson's claims against them would be dismissed based on the same failure to plead *Monell* liability. *See Melo*, 502 U.S. at 25 ("Suits against state

16

officials in their official capacity . . . should be treated as suits against the State.").
However, the Court will construe the complaint as suing the individual defendants in
their personal capacities.

### C.  Conditions of Confinement and Denial of Medical Care

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege "that the conduct
complained of was committed by a person or entity acting under color of state law, and
that the conduct deprived a person of rights, privileges, or immunities secured by the
Constitution." *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008)
(citing *Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004)).  Section 1983 does not create
substantive rights and instead provides "a procedure for redress for the deprivation of
rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).  The
conduct complained of must have "deprived the plaintiff of a right, privilege or immunity
secured by the Constitution or laws of the United States." *Wimmer v. Suffolk County
Police Dep't*, 176 F.3d 125, 136–37 (2d Cir. 1999).

Megginson alleges violations of the Fourteenth and Eighth Amendment arising
from (1) the conditions of his confinement, and (2) Defendants' failure to provide him
with medical assistance.

#### 1.  Conditions of Confinement

"A pretrial detainee's claims of unconstitutional conditions of confinement are
governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel
and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849
F.3d 17, 29 (2d Cir. 2017).  This is so because "[p]retrial detainees have not been
convicted of a crime and thus may not be punished in any manner—neither cruelly and
unusually nor otherwise." *Id.* (internal quotation marks and citation omitted).  That said,
"[a pretrial] detainee's rights are 'at least as great as the Eighth Amendment protections
available to a convicted prisoner.'" *Id.* (quoting *City of Revere v. Massachusetts General
Hospital*, 463 U.S. 239, 244 (1983)).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Id.* Two prongs must be satisfied: "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong'—perhaps better classified as a '*mens rea* prong' or 'mental element prong'—showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.*

    a.  Objective Prong

There is not a "static test" for determining whether conditions are "sufficiently serious" to satisfy the objective component; rather, "the conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* at 30 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)). The Second Circuit has "held that prisoners may not be deprived of their basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health." *Id.* (alteration in original) (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).

    Unsanitary conditions of confinement are analyzed on a case-by-case basis, "with reference to their severity and duration, not the detainee's resulting injury." *Id.* (citing *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015)). There is no "bright-line durational requirement for a viable unsanitary-conditions claim" nor a "minimal level of grotesquerie required." *Id.* at 31 (quoting *Willey*, 801 F.3d at 68). "The severity of an exposure may be less quantifiable than its duration, but its qualitative offense to a prisoner's dignity should be given due consideration." *Willey*, 801 F.3d at 68. "Although the seriousness of the harms suffered is relevant to calculating damages and may shed light on the severity of an exposure, serious injury is unequivocally not a necessary element of an Eighth Amendment claim." *Id.*; *see Ackridge v. Aramark Correctional Food Services*, No. 16 Civ. 6301 (KMK), 2018 WL 1626175, at *19 n.19 (S.D.N.Y. Mar.

18

30, 2018) ("[T]he objective prong . . . is evaluated the same way under both the Eighth Amendment and Fourteenth Amendment.").

The Court determines that Megginson's conditions of confinement, as alleged, were "sufficiently serious" to satisfy the objective prong. *Darnell*, 849 F.3d at 30. Megginson was allegedly housed in an unsafe, hazardous cell, in which the floor by the shower area caved in, allegedly due to vermin eating the plaster. Doc. 1 at 4. Upon his return to the West Facility, Megginson was placed back in the same cell, which continued to be infiltrated and infested by bugs. Doc. 1 at 5; Doc. 26 at 2 ¶ 5. Megginson was bitten by vermin on his face and body, including during his sleep, leading to swelling, pus, and a fever. Doc. 26 at 2 ¶ 6. Megginson ultimately contracted a bad infection for which he was treated with antibiotics.[19] Docs. 20 at 1, 26 at 2 ¶ 7.

Although Megginson does not claim that these conditions of confinement had a long duration—the timespan of his allegations is between one week, Doc. 1 at 4, and 30 days, Doc. 19 ¶ 7—the Court finds his exposure to the vermin infestation was sufficiently serious to survive dismissal. Megginson did not merely observe that bugs were present in his cell; rather, the vermin "infested" the cell where he was housed, they bit him during his sleep, and they actually harmed him physically to the point of causing a "bad infection" that required medical care. Docs. 26 at 2 ¶ 5, 20 at 1. The alleged conditions are more serious than those in which courts have found no constitutional violations. *Cf. Clay v. Lee*, No. 13 Civ. 7662 (KMK), 2019 WL 1284290, at *5 (S.D.N.Y. Mar. 20, 2019) (presence of cockroaches not enough to withstand dismissal of conditions of confinement claim where plaintiff did not allege he was "actually harmed" by cockroaches, and where

---

[19] Defendants argue that "Plaintiff simply states that he sustained a severe infection. However, he provides no further details as to when he saw a medical provider, what treatment he received, and whether he received an official diagnosis." Doc. 16 at 14. As previously discussed, at the motion to dismiss stage, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Walker*, 717 F.3d at 124. Additionally, "in a *pro se* case the court may, in its discretion, consider factual allegations made in the plaintiff's opposition papers as supplementing the Complaint." *Forrest*, 2023 WL 2432493, at *5. Therefore, Megginson's allegations that he contracted a "bad infection," and that he was ultimately prescribed antibiotics, are sufficient at this stage. Docs. 20 at 1, 26 ¶ 7.

plaintiff's conclusory allegations of extreme disgust, statement that the cockroaches "terrorized" him, and vague allusions to mental health issues were insufficient allegations that the cockroaches "presented a danger to his well-being"); *Butler v. Suffolk County*, No. 11 Civ. 2602 (JS) (ST), 2023 WL 5096218, at *42 (E.D.N.Y. Aug. 9, 2023) (at summary judgment, finding "limited sightings of mice and flies reported in Dorm Inspection Reports . . . without more, does not support an objective finding that said exposure violated the Plaintiffs' conditions-of-confinement"); *Benjamin v. Fraser*, 161 F. Supp. 2d 151, 173–74, 189 (S.D.N.Y. 2001) (emphasis added) (finding "no ongoing violation of federal law" with regards to vermin, in part because the housing areas were largely "free from vermin activity," and most residential areas did not have a "vermin *infestation*" even if they had "vermin *activity*," and denying in part and granting in part defendants' motion to terminate provisions of Consent Decrees), *aff'd in part, vacated in part*, 343 F.3d 35 (2d Cir. 2003).

Moreover, the severity of Megginson's contact with vermin was plausibly exacerbated by the other unsanitary conditions he identifies:  an exposed drain area where the floor had caved in, as well as flooding in his improperly sealed cell which aggravated the bug infestation.  Doc. 1 at 4, 5.  *See Fraser*, 161 F. Supp. 2d at 173 (quoting *Hoptowit v. Spellman*, 753 F.2d 779, 783 (9th Cir. 1985)) (referencing the Ninth Circuit's finding in *Hoptowit v. Spellman* that "[t]he health hazard caused by vermin at [a] penitentiary [was] exacerbated by the plumbing and ventilation inadequacies," and crediting plaintiff's argument that "[v]ermin carry disease . . . Their secretions are malodorous, and their saliva and hairs and certain body parts or feces may evoke allergic reactions and exacerbate asthmatic conditions.").

Therefore, Megginson's conditions of confinement were objectively severe enough to satisfy the objective prong of the Fourteenth Amendment claim.

b. *Subjective Prong*

Under the subjective prong, plaintiffs must "show[] that the officer[s] acted with at least deliberate indifference to the challenged conditions."  *Darnell*, 849 F.3d at 29.  Of note, the requisite *mens rea* to establish deliberate indifference in cases involving pretrial detainees (and thus, the Fourteenth Amendment) diverges from the *mens rea* requirement in cases involving convicted persons (and thus, the Eighth Amendment).  *Id*. at 34–35.  The Eighth Amendment imposes a subjective *mens rea* standard:  to be liable, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety."  *Id.* at 32 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  In contrast, however, the Fourteenth Amendment applies an objective *mens rea* standard:  the official need only "recklessly fail[] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  *Id.* at 35 (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)).  "Therefore, the detainee need not show that any defendant was subjectively aware of the harmfulness associated with the conditions." *Singleton v. City of New York*, No. 20 Civ. 8570 (ALC), 2022 WL 4620174, at *5 (S.D.N.Y. Sept. 30, 2022).

As an initial matter, the City argues that the claims against Commissioner Molina, Deputy Commissioner Miller, and ADW Glover in their individual capacities should be dismissed because the complaint fails to allege that they were personally involved in the alleged constitutional violations.  Doc. 16 at 17–18.  In a § 1983 action, a defendant "may not be held liable for damages for constitutional violations merely because [he or she] held a high position of authority."  *Gil-Cabrera v. Dep't of Corrections*, 20 Civ. 9493 (LTS) (SDA), 2021 WL 5282620, at *4 (S.D.N.Y. Sept. 27, 2021) (alteration in original) (quoting *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)), *report and recommendation adopted sub nom. Gil-Cabrera v. City of New York*, 20 Civ. 9493 (LTS) (SDA), 2021 WL 5910055 (S.D.N.Y. Dec. 14, 2021).  Instead, "[t]o hold a state official liable under §

1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official." *Id.* (alteration in original) (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020)). Here, Megginson does not specifically allege that Commissioner Molina, Deputy Commissioner Miller, or ADW Glover failed to address his conditions of confinement, nor that they were otherwise personally aware of or involved in that alleged constitutional violation. Megginson's only allegation specific to Commissioner Miller is that he placed Megginson on an illegal suicide watch, Doc. 19 at 2—however, Megginson elsewhere claims it was Warden Miller who placed him on suicide watch, Doc. 26 at 1 ¶ 4. His only allegations specific to ADW Glover are that he contacted her about his claims, and that she, along with Warden Miller, told the facility to not allow EMS in after Megginson reported his fall, Doc. 19 ¶ 1.[20] Beyond these statements, Megginson makes only a general claim that Commissioner Molina, Deputy Commissioner Miller, and ADW Glover—along with the other defendants— violated his constitutional rights by subjecting him to inhumane living conditions, Doc. 1 at 4. These statements, without more, are insufficient to assert the subjective prong as it pertains to Commissioner Molina, Deputy Commissioner Miller, and ADW Glover. Therefore, Megginson's conditions of confinement claim against them is dismissed.

As to Warden Miller, Defendants acknowledge that Megginson makes specific allegations against him personally, however they argue Megginson still "does not sufficiently allege how Warden Miller participated in the alleged constitutional violations." *Id.* The Court disagrees. First, Megginson provides that Warden Miller investigated his cell four times during the week of July 10, that Megginson explained "all issues of that cell" to Warden Miller, and that Warden Miller inspected the cell "on camera" on July 15. Docs. 26 at 1 ¶ 3, 19 ¶ 2. Therefore, Megginson plausibly pleads

---

[20] Megginson additionally mentions ADW Glover in stating that, when Warden Miller showed up on July 14, 2022, he requested that ADW Glover move Megginson to another cell. Doc. 26 ¶ 8. However, this statement does not appear to constitute an allegation of unconstitutional activity against ADW Glover.

that Warden Miller "knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Second, Megginson pleads that Warden Miller instructed him to "just deal" with his conditions of confinement, which plainly reflects a "deliberate indifference to the challenged conditions," sufficient to satisfy the subjective prong of the Fourteenth Amendment claim at this stage. Therefore, Megginson plausibly pleads that Warden Miller "recklessly failed to act with reasonable care to mitigate the risk" that the infestation posed to him. *Id.* Defendants' motion to dismiss Megginson's conditions of confinement claim against Warden Miller is denied.

### 2. Deliberate Indifference to Medical Needs

Megginson alleges that, following his fall into the collapsed floor, he was denied proper medical treatment for days until he could no longer walk properly. Doc. 1 at 4, 5.

In order to establish an Eighth Amendment claim of inadequate medical care, a detainee must show the defendants exhibited a "deliberate indifference to [his] serious medical needs." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (alteration in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). That is, plaintiff must allege that: (1) objectively, he suffered a sufficiently "serious medical condition," and (2) relevant prison officials acted with "deliberate indifference to that serious medical need." *Chavis v. Kienert*, No. 3 Civ. 39 (FJS) (RFT), 2005 WL 2452150, at *22 (N.D.N.Y. Sep. 30, 2005) (citing *Farmer*, 511 U.S. at 834–35). For pretrial detainees, the *mens rea* element of a claim for deliberate indifference of medical needs "is judged by the same 'deliberate indifference' standard articulated in *Darnell*," that is, "whether the official knew, or should have known, that his or her conduct posed an excessive risk to Plaintiff's health or safety." *Sanders v. City of New York*, No. 16 Civ. 7426 (PGG), 2018 WL 3117508, at *8 (S.D.N.Y. June 25, 2018) (first citation omitted) (quoting *Darnell*, 849 F.3d at 35).

Under the first, objective prong, the Second Circuit has held that a medical condition is "sufficiently serious" if it presents a "condition of urgency that may result in

degeneration or extreme pain," it "significantly affects daily activities," or it involves "chronic and substantial pain." *Mallet v. New York State Dep't of Corrections and Community Supervision*, 126 F.4th 125, 132 (2d Cir. 2025) (internal citations omitted). While the condition does not need to be "life-threatening" or "at the limit of human ability to bear," "it must be more than simply 'uncomfortable and annoying.'" *Id.* (citing *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003). "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Morgan v. Shivers*, No. 14 Civ. 7921 (GHW), 2018 WL 618451, at *8 (S.D.N.Y. Jan. 29, 2018) (citation omitted). "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Feliciano v. Anderson*, No. 15 Civ. 4106 (LTS) (JLC), 2017 WL 1189747, at *11 (S.D.N.Y. Mar. 30, 2017) (quoting *Demata v. New York State Correctional Dep't of Health Services*, 198 F.3d 233 (2d Cir. 1999) (unpublished)).

Here, Megginson's injuries resulting from his fall into the collapsed floor are not "sufficiently serious" to meet the objective prong of the Eighth Amendment claim. *Mallet*, 126 F.4th at 132. Megginson's "serious pain and fluid" from torn muscles in his leg, Doc. 1 at 5, his "ripped" meniscus, Doc. 20 at 1, and his inability to "walk properly" after not receiving "proper medical treatment for days," Doc. 1 at 5, while not insignificant, do not amount to a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Horace v. Gibbs*, 802 F. App'x 11, 14, 16 (2d Cir. 2020) (summary order) (agreeing with district court that a detainee's "low blood sugar and/or high blood pressure," "swelling and cuts" due to tight handcuffs, and "back and

knee pain . . . from sitting in an uncomfortable position in the parole car" were not "sufficiently serious to meet the objective prong," and affirming dismissal of deliberate indifference claim); *cf. Houston v. County of Westchester Dep't of Correction*, No. 6 Civ. 3395 (DC), 2006 WL 3498560, at *1 (S.D.N.Y. Dec. 5, 2006) (on motion to dismiss, where detainee "injured his right hand while sitting on a plastic chair that crumbled," and was first told by a doctor that he had a sprain, then later told he had a fracture, stating that the "fracture presented a 'condition of urgency,'" and thus "the objective prong of the inadequate medical care inquiry [wa]s satisfied"); *see also Culp v. Koenigsmann*, No. 99 Civ. 9557 (AJP), 2000 WL 995495, at *4 (S.D.N.Y. July 19, 2000) ("Meniscal tears are very common conditions in the knee.  They can be present for years without causing any symptoms.  Many patients 'live' with meniscal tears without ever having surgery."); *Espinal v. Coughlin*, No. 98 Civ. 2579 (RPP), 2002 WL 10450, at *4 (S.D.N.Y. Jan. 3, 2002) (at summary judgment, denying claim of delayed medical care and finding knee injury was not "a sufficiently serious medical condition for purposes of the Eighth Amendment," in part based on evidence that "a rupture of the ACL is a common knee injury and is often a chronic condition with which people may function well without operative intervention.").  In fact, Megginson alleges that it was days after he suffered the injury that he was not able to walk properly, and that he thereafter received medical attention.

Because Megginson does not meet the objective prong of the Eighth Amendment claim, the Court does not analyze the subjective, "deliberate indifference" prong, and it dismisses Megginson's § 1983 claim of inadequate medical care as to all Defendants.

### D.  Qualified Immunity

Defendants argue that, even if the Court finds that the individual defendants were personally involved in the alleged constitutional deprivations, the Court should dismiss the claims against them based on qualified immunity.  Doc. 16 at 18–19.  The only

§ 1983 claim that remains against an individual defendant is the conditions of confinement claim against Warden Miller.

The doctrine of qualified immunity generally shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). "[Q]ualified immunity shields federal and state officials from money damages unless [the] plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Sabir v. Williams*, 52 F.4th 51, 58 (2d Cir. 2022) (citation omitted). When a qualified immunity defense is asserted at the pleadings stage, defendants face a "more stringent standard," whereby "the facts supporting the defense [must] appear on the face of the complaint," or in the "documents incorporated by reference." *Id.* at 63–64 (quoting *McKenna v. Wright*, 386 F.3 432, 436 (2d Cir. 2004) and *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). Plaintiffs are "entitled to all reasonable inferences from the facts alleged, not only those that support [their] claim, but also those that defeat the immunity defense." *Id.* at 64. Thus, the Second Circuit has made clear that while a qualified immunity defense can succeed on a motion to dismiss, "such a defense 'faces a formidable hurdle . . . and is usually not successful." *Id.* (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)).

Here, Defendants argue that Warden Miller is entitled to qualified immunity because Megginson states in his complaint that Warden Miller "assess[ed] then address[ed]" the complaint after about one week, Doc. 1 at 5, and thus Megginson "only takes issue with the timing of the Warden's actions." Doc. 16 at 19. Defendants also state that Warden Miller did not violate a "clearly established constitutional right," and

26

that "a reasonable official in Warden Miller's role would not have believed that his actions violated Plaintiff's constitutional rights." *Id.*

The Court determines that Warden Miller is not entitled to qualified immunity at this stage. Drawing all reasonable inferences in Megginson's favor, his statement that Warden Miller failed to take action for one week, Doc. 1 at 5, is not a concession that Warden Miller adequately addressed the conditions of his confinement, nor that the only issue was Warden Miller's "timing," as Defendants suggest. As previously discussed, Warden Miller explicitly told Megginson to "just deal with" the conditions in his cell, even after inspecting the cell multiple times and being informed by Megginson as to "all issues of that cell." Doc. 19 ¶ 2. Therefore, Warden Miller explicitly declined to take action, exhibiting deliberate indifference. Moreover, Defendants do not substantiate their claims that there was no "clearly established constitutional right" and that "a reasonable official in Warden Miller's role would not have believed that his actions violated Plaintiff's constitutional rights." Doc. 16 at 19.

Based on the pleadings, Warden Miller's actions violated Megginson's "clearly established right to remain incarcerated in reasonably safe conditions," *Randle v. Alexander*, 960 F. Supp. 2d 457, 479 (S.D.N.Y. 2013), and it was not "objectively reasonable" for Warden Miller "to believe that his actions were lawful at the time of the challenged act.'" *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (citation omitted). Accordingly, Warden Miller is not entitled to qualified immunity.

### E. Negligence Claim

Megginson's complaint lists, as one of his alleged injuries, "neglect" for being left without medical assistance for hours after his accident. Doc. 1 at 5. Therefore, in addition to Megginson's § 1983 claims, his complaint may be liberally construed to allege a negligence claim under state law.

Federal district courts may exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that

they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *see also Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 27 (2025) (stating that, under § 1367(a), as under *Mine Workers v. Gibbs*, 383 U.S. 715 (1966), supplemental jurisdiction applies to state-law claims that arise "from the same facts" as a federal-law claim over which a court has original jurisdiction). Supplemental jurisdiction represents "a doctrine of discretion, not of plaintiff's right." *Kolari v. New York-Presbyterian Hospital*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Section 1367(c) lists circumstances in which a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a)[.]" 28 U.S.C. § 1367(c). One such circumstance is where "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). Subject matter jurisdiction in the instant action is based on federal question jurisdiction. 28 U.S.C. § 1331.

Although the Court is not dismissing *all* of Megginson's claims over which it has original jurisdiction in the instant action, it is dismissing the § 1983 claim that is premised on the same set of facts as the state law negligence claim: Defendants' delay in providing Megginson with medical care. Having dismissed that federal claim under Rule 12(b)(6), the Court declines to adjudicate the state law negligence claim. *See Royal Canin*, 604 U.S. at 33, 39 (explaining that "with any federal anchor gone, supplemental jurisdiction over the residual state claims disappears as well," and holding that when a plaintiff amends a complaint to excise the federal claims, leaving the complaint with only state claims, the plaintiff "divests the federal court of adjudicatory power"); *see also Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 404 (2d Cir. 2017) (Calabresi, J. concurring) (noting that "after all federal claims have been dismissed, the default rule is that federal courts should not decide related state–law claims unless there is good reason for doing so"); *Gibbs*, 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by

procuring for them a surer-footed reading of applicable law . . . [I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well."). Therefore, Megginson's state negligence claim is dismissed.

### F.  Leave to Amend the Complaint

In his surresponse, Megginson requests that the Court allow him to "amend the complaint to specify more detail to the complaint."  Doc. 26 at 3 ¶ 4.[21]

As a general rule, leave to amend a complaint should be freely granted.  *Jin v. Metropolitan Life Insurance Co.*, 310 F.3d 84, 101 (2d Cir. 2002); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). District courts have broad discretion in deciding whether to grant leave to amend. *Pasternack v. Laboratory Corp. of America*, 892 F. Supp. 2d 540, 549 (S.D.N.Y. 2012). For *pro se* litigants, the Court should generally not dismiss a complaint without granting leave to amend, if a valid claim could be stated.  *Clifton v. Hra Nyc Govt*, No. 16 Civ. 1753 (RRM) (CLP), 2016 WL 4203486, at *1 (E.D.N.Y. Aug. 9, 2016) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).  The Court may decline to provide the opportunity to amend if the court finds that the plaintiff "cannot correct the defects in the federal claims" and therefore "any attempt to amend the pleading  . . . would be futile." *Shorter v. Rice*, No. 12 Civ. 111 (JFB) (ETB), 2012 WL 1340088, at *4, *5 (E.D.N.Y. Apr. 10, 2012); *see also Cuoco*, 222 F.3d at 112 ("The problem with [the plaintiff's] causes of action is substantive; better pleading will not cure it.  Repleading would thus be futile.  Such a futile request to replead should be denied.").

In the instant case, Megginson provides new details about the events surrounding his injuries and Defendants' actions in his memorandum of opposition, Doc. 19, his "motion to request summary judgment and towards settlement agreement," Doc. 20, and his surresponse to Defendants' motion to dismiss, Doc. 26.  For example, whereas in his

---

[21] Because Megginson makes this request in his surresponse, Defendants do not respond to the request.

complaint, Megginson states that he notified the 311 System of his need for "serious medical treatment for possible injuries" after his fall but was "given no proper medical treatment," Doc. 1 at 4–5, he adds in his opposition that "311 sent EMS ambulatory services to respond," but Defendants told the facility to not allow EMS in.  Doc. 19 ¶ 1.[22] Also, whereas in his complaint, Megginson notes he had torn muscles in his leg, Doc. 1 at 5, he specifies in a later filing that he suffered from a "ripped" meniscus, Doc. 20 at 1. This iterative expansion and clarification of the record demonstrates that Megginson may be able to provide a more complete accounting of his allegations if given the opportunity file an amended complaint.

Further, Megginson makes certain general allegations for which it is unclear whether he is referring to one of the individual defendants, such as the statements that "Alam and *[an]other officer* . . . call[ed] for a medical emergency," Doc. 19 ¶ 1 (emphasis added), and that "[t]he *Defendant*" failed to complete the investigation, *id.* ¶ 7 (emphasis added).  If Megginson wishes to continue to assert claims against the individual Defendants named in the initial Complaint, he should clarify whether any of his existing allegations refer to any particular Defendant, and he must add additional facts that allege personal involvement of the Defendants in depriving him of his rights.

Finally, Megginson's pleadings contain certain informational gaps, which if clarified, could help cure the defects in his claims.  For example, Megginson does not explain the nature of his injuries immediately following his fall into the hole, which precipitated "Alam and *[an]other officer* . . . calling for a medical emergency."  Doc. 19 ¶ 1.  He also does not describe in detail to what extent or in what way he "could no longer walk properly" after days of not receiving medical attention, Doc. 1 at 5.  Adding such details could shed light on how much—and how quickly—his medical condition

---

[22] The Court does not view these as "contradictory allegations," as Defendants do, *see* Doc. 22 at 8, but rather as supplementary information and detail.  The only clear contradiction that the Court identifies in Megginson's filings is that he first identifies Deputy Christopher Miller as having placed him on suicide watch, then he later identifies Warden Miller as having done so.  *Compare* Doc. 19 ¶ 1 *with* Doc. 26 ¶ 4.

deteriorated after the initial fall into the hole. Megginson also does not specify whether adequate medical treatment was eventually provided to him, and if so, at what point. Megginson should include all of the information in the amended complaint that he wants the Court to consider in deciding whether the amended complaint states a claim for relief for a denial of appropriate medical care.

Essentially, Megginson's amended complaint should tell the Court: specifically who violated his federally protected rights; when and how such violations occurred; and why he is entitled to relief.

Because Megginson's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that he wants to include from the original complaint must be repeated in the amended complaint.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

- The § 1983 conditions of confinement claim against Warden Miller is not dismissed, but the § 1983 claim of denial of medical care is dismissed as to Warden Miller.
- All § 1983 claims are dismissed as to the City, Commissioner Molina, Deputy Commissioner Miller, and ADW Glover.

The Court declines to exercise supplemental jurisdiction over the state law negligence claim.

Megginson must file his Amended Complaint, if at all, by April 22, 2025.

The Clerk of the Court is respectfully directed to terminate the motion, Doc. 14.

It is SO ORDERED.

Dated:    March 25, 2025
         New York, New York

                                                  EDGARDO RAMOS, U.S.D.J.